# CAINE v. HAGENBARTH.

No. 2094. Decided January 6, 1910. On Application for Rehearing, February 11, 1910 (106 Pac. 945).

1. CONTRACTS—CONSTRUCTION—INTENT. The primary object in the construction of a contract is to discover the intent of the parties from a consideration of the whole contract. (Page 78.)

2. CONTRACTS—CONSTRUCTION—EQUITABLE AND UNCONSCIONABLE RESULT. Where the exact meaning of a written contract is in doubt, as where the language used is contradictory and obscure, and there are two interpretations possible, one of which establishes a comparatively equitable contract and the other an unconscionable one, the former should prevail. (Page 82.)

3. MINES AND MINERALS—MINING OPTION—TRANSFER—CONSIDERATION—CONDITIONS. Plaintiffs had secured from a mining company an option on a copper mine for sixty days from January 17, 1907, for one million dollars, provided they paid five thousand dollars of the purchase price within thirty days, and thereafter in the event of a sale two hundred and forty-five thousand dollars in two months from the date of the option, and the balance in equal installments in four, six, and eight months from that date. The option was valueless to plaintiffs unless they could sell it within the time specified to a person able to perform, and after one attempted sale had failed, when the option had only thirty-nine days to run, plaintiffs effected an assignment thereof to defendant in consideration of two hundred thousand dollars, the writing reciting that plaintiffs sold all their right, title, and interest in the option described, and did "by this conveyance for the consideration therein

named convey the following described mining property and claims"
to defendant, conditioned on the following payments:  Ten thousand
dollars, part of the two hundred thousand dollars, paid at once;
forty thousand dollars to be paid "at the time when" defendant
shall be required to pay to the mining company the first payment
under the option; the remaining portion—one hundred and fifty
thousand dollars—to be paid "in proportionate amounts on the
dates when the payments are made" by defendant under the terms
of the option to the mining company.  *Held*, that such assignment
did not bind defendant absolutely and in all events to pay the
balance of the two hundred thousand dollars consideration, but
that his liability for such amount was conditional on his completing
the option, and thereby becoming obligated to pay the mining com-
pany the installments of the purchase price for the mine, and
defendant having elected not to take up the option was not liable
to plaintiffs for the balance of the consideration.  (Page 94.)

ON APPLICATION FOR REHEARING.

4. EVIDENCE — PAROL EVIDENCE — WRITTEN CONTRACT — AMBIGUOUS
   TERMS—EXPLANATION.  Such assignment contract was not so plain
   and unambiguous as to preclude the admission of extrinsic evidence
   of the surrounding facts and circumstances, the nature of the sub-
   ject-matter, the relation of the parties, and the purposes sought to
   be obtained thereby to aid in its construction.  (Page 97.)

APPEAL from District Court, Third District; *Hon. T. D.
Lewis*, Judge.

Action by Joseph E. Caine and another against F. J. Ha-
genbarth.

Judgment for plaintiffs.   Defendant appeals.

REVERSED AND REMANDED, WITH DIRECTIONS.

*Dickson, Ellis, Ellis & Schulder* for appellant.

*C. S. Price* and *Van Cott, Allison & Riter* for respondents.

APPELLANT'S POINTS.

The question as to what is the true construction of a writ-
ten instrument is one of law, to be answered by the court.

If the writing is upon its face ambiguous, or uncertain, the court may receive evidence as to the situation of the parties and the facts and circumstances surrounding them at the time they entered into the agreement. (*Manti City Sav. Bank v. Peterson,* 33 Utah 209, 216-17; *Dwight v. Germania Life Ins. Co.,* 103 N. Y. 341, 57 Am. St. Rep. 729, 722-4; *R. L. Polk Printing Co. v. Smedley,* 155 Mich. 249; 2d Parsons on Contracts (4th Ed.), p. 4; *Smith, Admr., v. Faulkner et al.,* 12 Gray [Mass.] 251, 254-6.) The burden is on the plaintiffs. (*Breckenridge v. Crocker,* 78 Cal. 529.) The object of all established rules for the interpretation of contracts is to ascertain the intention of the parties thereto. (2nd Parsons, pp. 7-12; *Gibson v. Miney,* 1 H. B. L. 569; *Rankin v. New England, etc., Mining Co.,* 4 Nev. 78; *V. & T. R. R. Co. v. Lyon Co.,* 6 Nev. 68; *Mutual Life Ins. Co. v. Kelly,* 114 Fed. 268; *Walsh v. Hill,* 38 Cal. 481; *Haverley v. Brumagin,* 33 Cal. 394; *Darby v. Arrowhead H. S. H. Co.,* 97 Cal. 384; *Piano Mfg. Co. v. Ellis,* 68 Mich. 101; *Muldoon v. DeLine,* 135 N. Y. 150; *Gavinzel v. Crump,* 22 Wall. 308; 17 Am. & Eng. Ency. of Law, pp. 2-3-21; *Schuykill Navigation Co. v. Moore,* 2 Wharton 491; *Harrison v. Fortlage,* 161 U. S. 57; *Cravens v. Mills Co.,* 16 Am. St. Rep. 298; *Francis Bros., etc., v. Heinc Safety Boiler Co.,* 112 Fed. 899; *Fitzgerald v. First N. Bank,* 114 Fed. 474; *Chicago, etc., Ry. v. Reilly,* 145 Fed. 137; Potter's Dwarris on Statutes, p. 143; *Ogden v. Glidden,* 9 Wis. 40; *Hudson Canal Co. v. Penna. Coal Co.,* 8 Wall. 276.) Where the language of an agreement is contradictory or ambiguous, so that it is fairly susceptible of two constructions, one of which makes it a fair contract, while the other makes it inequitable, the interpretation which makes it rational and probable must be preferred to that which makes of it an unusual, unfair or improbable contract. (*Coghlan v. Stetson,* 19 Fed. 737; *Washington, etc., Ry. Co. v. Coeur d' Alene Ry. Co.,* 160 U. S. 77; *Salt Lake v. Smith,* 104 Fed. 457; *Pressed Steel Car Co. v. Railroad,* 121 Fed. 609; *American Bonding Co. v. Pueblo Invest. Co.,* 150 Fed. 17. See also *Scott*

*v. The United States,* 12 Wall, 443 ; *Jacobs v. Spaulding et al.,* 71 Wis. 177, 186; *Turner v. Kearney,* 106 Cal. 62, 47; *Johnston v. Schenck,* 15 Utah 490.) What one party. to .a contract understands or believes is not to govern its construction, unless such understanding or belief was induced by the conduct or declarations of the other party. (*Bank v. Kennedy,* 17 Wall, p. 19.) There is no contract, unless the parties thereto assent; and they must assent to the same thing, in the same sense. (1 Parsons on Contracts [5th Ed.], p. 475; 1 Chitty on Contracts, 11th Am. Ed., p. 11; *Breckenridge v. Crocker,* 78 Cal. 529, 535-537; *Hartford & New Haven v. Jackson* [24 Conn.], 63 Am. Dec., p. 177; *Utley v. Donelson,* 94 U. S. 29, 47-48; *Harvey v. Duffy,* 99 Cal. 401; *Menx v. Hogue,* 91 Cal. 442, 448; *Rovengo v. Defferari,* 40 Cal. 459, 462-3; *National Bank v. Hall,* 101 U. S. 43, 49-50; *Rockefeller v. Merritt,* 76 Fed. 909, 915.) There can be no more satisfactory evidence of the actual value of property than that furnished by an actual sale of it by the owner, unless there be evidence that the circumstances under which this sale was made were such as would preclude, or be likely to preclude, the owner realizing a fair price for his property. (*The Albert Dumois,* 177 U. S. 240, 255; *Lynch v. United States,* 138 Fed. 535, 539; *Kaufman v. Pittsburg C. & W. R. Co.* [Pa. St.], 60 Atl. 2; *Grand Rapids v. Loose,* 92 Mich. 92; *Hangen v. Hachemeister* [114 N. Y.], 11 Am. St. Rep. 691, 695-6; *Mayor, etc., of Baltimore v. Smith & S. B. Co.,* 31 Atl. Rep. 423.) It is contended by plaintiffs that where a contract is ambiguous, the construction must be against the party who is responsible for the ambiguity, and also against the promisor. This is a rule of construction which is never invoked except as a last resort. (See Wharton's Legal Maxims, closing paragraph on page 206; Broom's Legal Maxims, p. 593; 2 Parsons on Contracts [4th Ed.], p. 19-21; 1 Chitty on Contracts, pp. 137-8; 17 Am. and Eng. Law, p. 16.)

RESPONDENT'S POINTS.

It is very elementary that the contract of sale is not an option. See 21 Ency. Law (2 Ed.), 924-5. When a person receives title to property and retains it as the defendant did and is to pay for the same in the language stated, he is obligated to pay in any event. (*Nunez v. Dantel*, 19 Wall. [U. S.] 560; *Johnston v. Schenck*, 15 Utah, 490; *Alvord v. Cook*, 174 Mass. 120; *Page v. Cook*, 164 Mass. 116; *Eaton v. Yarborough*, 19 Ga. 82; *Crooker v. Holmes*, 65 Me. 195; *Haines v. Weirick*, 155 Ind. 548; *Noland v. Bull*, 33 Pac. [Ore.] 983; *Hicks v. Shouse*, 17 B. Mon. 483. See also to the same effect: *De Wolfe v. French*, 51 Me. 420; *Sears v. Wright*, 24 Me. 278; *Randall v. Johnson*, 59 Miss. 317; *McCarty v. Howell*, 24 Ill. 342; *Button v. Higgins*, 38 Pac. 390; *Crass v. Scruggs*, 115 Ala. 258; *Walters v. McBee*, 1 Lea [Tenn.] 364; Paige on Contracts, Sec. 1156; *Lewis v. Tifton*, 75 Am. Dec. 498; *Ubsdel v. Cunningham*, 22 Mo. 124; *Hood v. Hampton Plains, etc.*, 106 Fed. 408.) When an appellate court is asked to set aside the verdict of a jury in a common-law action upon the facts, all conflict in the evidence must be resolved in favor of the party in whose favor the verdict was rendered. (*Chicago, etc., Ry. v. Sharp*, 63 Fed. 533; *Railroad Co. v. Conger*, 5 C. C. A. 411, 56 Fed. 20; *Railroad Co. v. Teeter*, 63 Fed. 527; *Railway Co. v. Lowell*, 151 U. S. 209, 14 Sup. Ct. 281; *Connor v. Raddon*, 16 Utah 418; *Smith v. Ireland*, 4 Utah 187.) If the contract between the parties is to be interpreted from the standpoint of its being uncertain or ambiguous, an interpretation should be taken which favors the one who parted with his property. (*Noonan v. Bradley*, 9 Wall. 407; *Barney v. Newcomb*, 9 Cush. 56; *Hawkins v. Graham*, 149 Mass. 287; *Evans v. Sanders*, 33 Am. Dec. 298.) A contract is to be interpreted against the one who is responsible for the ambiguous language. (*Christian v. First National Bank*, 155 Fed. 709; *Noonan v. Bradley*, 9 Wall. [U. S.] 394, 407, 19 L. Ed. 757; *Texas & Pacific Ry. Co. v. Reiss*, 183 U. S. 621, 626, 22

Sup. Ct. 253, 46 L. Ed. 358; *Osborne v. Stringham*, 4 S. D. 593, 57 N. W. 776; *Imperial Fire Ins. Co. v. Coos*, 151 U. S. 462-3.) The construction in case of ambiguity or uncertainty is in favor of the one who has parted with his property, or with his premium. (*Blankenship v. Decker*, 85 Pac. 1037; *Bickford v. Kerwin*, 30 Mont. 1, 75 Pac. 518; *Gillet v. Bank of America*, 160 N. Y. 549, 55 N. E. 292; *Wilson v. Cooper* [C. C.], 95 Fed. 625; *Allen-West Com-Co. v. People's Bank* [Ark.], 84 S. W. 1041; *Hill v. John P. King Mfg. Co.* [Ga.], 3 S. E. 445; *Imperial Fire Ins. Co. v. Coos County*, 151 U. S. 452, 14 Sup. Ct. 379, 38 L. Ed. 231; *Noonan v. Bradley*, 9 Wall. [U. S.] 394, 19 L. Ed. 757; *Webster v. Dwelling House Ins. Co.*, 53 Ohio St. 558, 42 N. E. 546, 30 L. R. A. 719, 53 Am. St. Rep. 658, 9 Cyc. 509.) As authorities to the effect that an isolated sale is not competent evidence of value, we cite: *Pate v. Mitchell*, 79 Am. Dec. [Ark.] 114, 115; *People, etc., v. McCarthy*, 8 N. E. [N. Y.] 85, 87; *Spring Valley, etc., v. Drinkhouse*, 92 Cal. 528, 532; *Omaha S. R. Co. v. Todd*, 58 N. W. [Neb.] 289, 291. Evidence of sales of *similar* property is not competent for the purpose of proving value. (*Railroad Co. v. Benson*, 36 N. J. Law, 557; *Railroad Co. v. Hiester*, 40 Pa. St. 53; *Railroad Co. v. Bunnell*, 81 Pa. St. 414; *Railroad Co. v. Ziemer*, 17 Atl. 187; *Railroad Co. v. Pearson*, 35 Cal. 247, 262; *Railroad Co. v. Keith*, 53 Ga. 178.) Error without prejudice is not ground for reversal. (*Snell v. Crowe*, 3 Utah 26; *Rogers v. Railroad* [Utah], 90 Pac. 1075; *Chambers v. Emery*, 13 Utah 405; *Western, etc., Soc. v. Desky*, 24 Utah 347; *Jenkins v. Mammoth M. Co.* 24 Utah 513.) If it be assumed that error was committed and yet the result would not have been changed by admitting the testimony, still the judgment must be affirmed. (*Chambers v. Emery*, 13 Utah 405; *Wolcott v. Smith*, 15 Gray 537; *Coal Co. v. Kelly*, 156 Ill. 9.) An appellate court will not reverse the judgment for an error of law which did not affect the merits. (*Chambers v. Emery*, 13

Utah 405; *Maynard v. Locomotive, etc., Assn.,* 16 Utah 150; Compiled Laws of Utah 1907, secs. 3285, 3008).

FRICK, J.

On the 17th day of January, 1907, respondents entered into an agreement in writing with the Ludwig Copper Mining Company, a corporation, whereby they were given an option to purchase certain copper mines of said company located in the State of Nevada. The option was good for sixty days at the stipulated price of $1,000,000 for the mine, provided the respondents paid $5,000 of the purchase price within thirty days from the 17th day of January aforesaid; and thereafter, if the option eventuated in a sale, the purchase price was to be paid, $245,000 in two months from the date of the option, $250,000 in four months, $250,000 in six months, and the remaining $250,000 in eight months from said date. This option agreement, by consent of the parties, was deposited with the Anglo-California Bank of San Francisco, Cal., and with it was deposited a check of one of the respondents for said sum of $5,000, which was, however, not to be presented for payment unless so ordered by him. On the 7th day of February, 1907, the respondent Caine, for himself and as attorney in fact for his co-respondent, entered into a written agreement with the appellant, the material parts of which are as follows:

"This agreement, made and entered into this 7th day of February, 1907, by and between Jos. E. Caine, of Salt Lake City, Utah, and Max Junghandel, by his attorney in fact, Jos. E. Caine, parties of the first part, and F. J. Hagenbarth, of Salt Lake City, Utah, party of the second part, witnesseth: That the said first parties do this day sell, transfer and assign for and in consideration of two hundred thousand dollars, all their right, title and interest in and to a certain written option agreement in writing dated January 17, 1907, which they have made with the Ludwig Copper Mining Co., a corporation of the State of Nevada, and the said first parties do by this conveyance for the consideration therein named, convey the following described mining property and claims to the said second party, to wit: [Here follows a lengthy description of the property included within the option.] . . . under the terms of said written agreement herein refererred to, and

conditioned upon the following payments, to-wit: ten thousand dollars, being a part of the two hundred thousand dollars herein named, be paid in cash upon the execution of this agreement, receipt of which is hereby acknowledged; forty thousand dollars to be paid to the said first parties at the time when the said second party shall be required to pay to the Ludwig Copper Mining Co. the first payment under the terms of said written agreement or any modification thereof as to the time of said payment; the remaining portion of said consideration, being one hundred and fifty thousand dollars, shall be paid by the said second party to the said first parties in proportionate amounts on the dates when the payments are made by the said second party under the terms of said written agreement or any modification thereof, to the Ludwig Copper Mining Company."

The appellant paid respondents $10,000 of the $200,000 mentioned in said agreement, and also advanced the $5,000 necessary to continue the option in force beyond the thirty days, making a total payment made by him of $15,000, $10,000 of which was to apply on the $200,000 and $5,000 on the $1,000,000, purchase price of said copper mine. The $15,000 payment was made some days after the foregoing agreement was entered into, and was withheld by appellant until the original option agreement entered into between said copper company and respondents could be deposited by respondents in McCornick's bank, at Salt Lake City, Utah, which was done February 15, 1907. Appellant, after causing the underground workings of the mine in question to be examined by experts, refused to take up said option. That is, he refused to purchase the mining property in question and made no other payment, except as above stated. When the time arrived at which the $245,000 payment on the purchase price of the mine would have been due had the option not been forfeited, the respondents demanded payment from the appellant of the $40,000 mentioned in the agreement we have set forth; and when the second payment under the option would have been due the respondent demanded from the appellant the further sum of $50,000. Appellant refused to pay either of the sums demanded, and respondents commenced this action, and in their complaint, in substance, at least, the foregoing facts are made to appear.

In the first complaint filed respondents pleaded and relied upon the written agreement in the form in which we have copied it. Appellant demurred to this complaint, and the court sustained the demurrer upon the ground that the agreement was ambiguous and uncertain, whereupon respondents amended their complaint. In the amended complaint they more fully set forth the transaction, and also pleaded the legal effect of the agreement as they construed it to be. Appellant answered this complaint, and, in his answer, after admitting making the agreement and some other matters, denied all the facts relating to his liability; and further denied respondents' statement respecting the legal effect of said agreement, and also pleaded the legal effect as appellant construed the writing in question. At the trial there was a large mass of evidence introduced by both parties, and the court made findings of fact based upon such evidence. Appellant attacks some of these findings as not sustained by the evidence and as contrary thereto. In view that such parts of the evidence as we deem material are not disputed, and for the further reason that both parties insist that we may arrive at the true meaning of the written agreement without resorting to extrinsic evidence, we will not discuss the findings nor allude to them further.

The following facts and deductions from other facts will, we think, not be disputed, namely, that respondents had a mere option to purchase the mine in question, and had no other rights in or to the same; that neither at the time the option agreement was obtained, nor at any other time thereafter, were the respondents able to purchase the property in question; that they had theretofore offered the option to some one else, but the party to whom the offer had been made refused to enter into an agreement to purchase the mining property; that respondents had to rely upon finding some other purchaser able and willing to take up the option, and that unless they found some such purchaser within the life of the option, unless the same was extended, the option became worthless, and if they continued it in force for more

than thirty days they might lose $5,000 by the venture; that the real value of the mine was speculative and in a large measure uncertain, although both respondents and appellant believed it to be worth more than the purchase price named in the option agreement, but this belief was not based upon actual or known facts; that when the option was transferred from respondents to appellant it had but thirty-nine days to run, and when the papers were finally turned over to appellant, there were but thirty-one days left; that the value of the option, to some extent at least, necessarily depended upon the time respondents had within which to find a purchaser for the mine in question; that appellant apparently thought the purchase a good one and was desirous of making it, and respondents were correspondingly desirous to sell and transfer the option to some one able to complete the purchase upon the terms and conditions named in the option agreement.   There are some other features to which we shall refer hereafter.

The court construed the agreement above set forth as though it were one for the sale of property at a fixed consideration which was agreed to be paid at the happening of some future event, the time of such event, in this case, having been stipulated by the parties, and the time when appellant was obligated to pay under the agreement was at the happening of the event referred to.   The court found for the respondents, and entered judgment in their favor for the sum of $90,-000 and accrued interest.

Counsel for appellant contend that the court erred in its construction of the written agreement.   As we have already intimated, both parties now insist that the agreement is not ambiguous nor uncertain, and hence extrinsic evidence is not necessary as an aid in ascertaining the true meaning of the language or the intention of the parties.   We think, however, that the trial court was right in concluding that the meaning of the language used by the parties is not entirely clear nor free from ambiguity, and hence it is proper to consider extrinsic evidence, to the extent at

least that we have outlined above, for the purpose of arriving at the real intention of the parties according to the sense in which they intended to apply the language used by them and to aid us in arriving at such intent. While counsel for appellant contend that the language is free from all ambiguity, they, nevertheless, insist that whether the language contained in the writing is construed by itself or in the light of the extrinsic matters stated, in either event but one conclusion is legally permissible, and that is, that the trial court erred in the construction it placed upon the writing. Counsel further contend that the events mentioned in the writing were not primarily intended as fixing a time when payments should be made, but that the happening of the events was the condition upon which depended the right of respondents to demand and the duty of appellant to pay said sum of $190,000 in addition to the $10,000 theretofore paid by him. Stating it in another form, counsel insist that the happening of the events mentioned in the agreement was not intended as fixing the time when appellant should be required to pay the additional $190,000, but that it was intended that when he actually made the payments to the copper company for the mining property, then, and then only, should appellant become obligated to pay the respondents the additional amount aforesaid, and that the amounts for which appellant thus became obligated would become due and payable at the same time that the obligation to pay the copper company arose. That is, if appellant took up the option and thus became legally obligated to pay the copper company the purchase price of the mine, by the same act he also became obligated to pay respondents said $190,-000 which was to be paid at the time and in the manner stated in the agreement. While counsel for both sides seem quite certain that they are right in their contentions, we confess that we have found the matter not entirely free from difficulty. The amount involved, and the possible effect the result might have upon their clients, necessarily engender strong feelings in counsel on both sides, and they thus are

led to use strong language in support of their respective claims. While the effect that the enforcement of a contract may have upon a particular party cannot influence the judgment of the court, still the effect or result that may follow a particular construction always is proper to be considered by the court, and will be. considered, if for no other purpose than to induce the court to make a more searching examination of, and to more thoroughly reflect upon the questions involved in the controversy. In this connection it is but just to say that if the question is decided one way it might result in transferring from appellant all that he is possessed of, while, upon the other hand, if the appellant has assumed the obligation and has unconditionally agreed to pay, as contended for by respondents, then we have no right to withhold from them that which legally is theirs any more than we have a right to require appellant to yield up his property unless he has legally bound himself to pay.

The questions, therefore, are: What is the obligation appellant has assumed in entering into the written agreement, and what are respondents' rights in view of its provisions? The answers to these question depend upon the true meaning of the language contained in the writing and the intention of the parties as such intention existed at the time they entered into the agreement. To determine this meaning and intention is our duty, and in discharging it we must, of course, have recourse to the language of the parties, which must be considered and applied to the subject-matter in accordance with the rules of construction which the courts have adopted as guides or aids in determining the intention of those whose words are subject of construction. We will briefly refer to some of those rules known as rules of construction. In 2 Paige on Contracts, section 1104, the author says: "The primary object of construction in contract law is to discover the intention of the parties. This intention in express contracts is, in the first instance, embodied in the words which the parties have used and is to be deduced therefrom." Again, in section 1106, it is said: "The context and

subject-matter may affect the meaning to be given to the words of a contract, especially if in connection with the subject-matter the ordinary meaning of the term(s) would give an absurd result." So the general paramount intent controls the special intent, and in this way it sometimes becomes necessary either to enlarge or to restrict the ordinary meaning of words in order to preserve the paramount intent of the parties to the agreement. (2 Paige on Contracts, sec. 1113.) One of the cardinal rules requires that "as between two constructions, each probable, one of which makes the contract fair and reasonable and the other of which makes it unfair and unreasonable, the former should always be preferred." (2 Paige on Contracts, sec. 1121.) Another author, whose work on contracts has, for many years, been recognized as a standard authority, namely, Parsons on Contracts, in volume 2 (9th Ed.), star page 494, says: "The first point is usually to ascertain what the parties themselves meant and understood." And, on page 501 of the same volume, it is said: "The court will endeavor to give to the contract a rational and just construction."

Referring, now, to some cases wherein the courts have given expression to some of the rules that should be applied in construing contracts, we find that in an early case decided by the Supreme Court of Pennsylvania, Mr. Chief Justice Gibson, who is recognized as one of the beacon lights of American jurisprudence, uses the following language:

"The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it; for it may be safely assumed that such was the aspect in which the parties themselves viewed it. A result thus obtained is exactly what is obtained from the cardinal rule of intention." *Schuylkill, etc., Co., v. Moore,* 2 Whart. (Pa.), 490.

So, in *U. S., etc., Co. v. Board of Com'rs,* 145 Fed., Mr. Justice Sanborn, in speaking of the rules to be observed in construing contracts, at page 148, 76 C. C. A., at page 118, says:

37 Utah—6

"The purpose of every written contract is to express the intention of the parties. The object of all construction of agreements is to ascertain that intention to the end that it may be enforced. The court should, as far as possible, put itself in the place of the parties when their minds met upon the terms of the agreement, and then from a consideration of the writing itself, its purpose, and the circumstances which conditioned its making endeavor to ascertain what they intended to agree to do—upon what sense or meaning of the terms they used their minds actually met."

Mr. Justice Sanborn then proceeds to state that the intention must be gleaned from a consideration of the whole instrument and from all of its provisions, and not only from certain parts or fragments, and that all parts should be harmonized, and then proceeds as follows:

"The actual intent of the parties when thus ascertained must prevail over the dry words, inapt expressions, and careless recitations in the contract, unless that intention is directly contrary to the plain sense of the binding words of the agreement."

The case of *Coghlan v. Stetson* (C. C.), 19 Fed. 727, affords a strinking illustration of how far courts sometimes are required to depart from the mere dry words used by the parties in their contracts in order to preserve their real intention and to pevent injustice. Mr. Justice Coxe, in speaking for the court in that case, at page 729, says:

"The interpretation contended for by the defendant is so harsh, so unfair, so wanting in reciprocity that the court should not hesitate to reject it, provided the instrument is susceptible of any reasonable construction. . . . If the language used clearly establishes the defendant's version, it would unquestionably be the duty of the court to enforce it. But where the exact meaning is in doubt, where the language used is contradictory and obscure, if there are two interpretations, one of which establishes a comparatively equitable contract and the other an unconscionable one, the former construction should prevail."

We are fully aware that counsel for respondents insist that their version of the contract in question is not unfair, unjust, nor ambiguous. With this contention we cannot agree, and we refer to the case just cited from which it appears that

the contract under consideration there was, if anything, less harsh in its consequences, and the meaning of the words used by the parties, in our judgment, was less obscure than is the meaning of the words used in the contract in question, yet the court applied the rule above announced and enforced it. The following cases will be found to fully sustain and enforce the doctrine laid down in the foregoing quotations: *Wash. & I. R. Co. v. Coeur d'Alene Ry. Co.,* 160 U. S. 101, 16 Sup. Ct. 231, 40 L. Ed. 346; *Salt Lake City v. Smith* 104 Fed. 457, 43 C. C. A. 637; *Pressed Steel Car Co. v. Eastern Ry. Co.,* 121 Fed. 611, 57 C. C. A. 635; *American Bonding Co. v. Pueblo Inv. Co.,* 150 Fed. 27, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557. See, also, 17 A. & E. Ency. L. (2d Ed.), pp. 2, 17, where the doctrine is admirably stated. We might cite and quote from numerous other cases, but a reference to the foregoing is quite sufficient to illustrate the principle we are invoking. Moreover, as is well stated by Mr. Page in his excellent work on Contracts, concrete cases are, as a rule, valuable only for the purpose of illustrating the rules of construction, and that, except in particular kinds of contracts, each case must, to a large extent, be determined upon the peculiar phraseology of the contract in question and the peculiar circumstances surrounding the parties.

Considering the contract in question in the light of the foregoing rules, what was the real intention of the parties at the time they entered into the agreement? It is clear, we think, that the parties at all events intended that the agreement in question should constitute a sale and transfer of the option from respondents to appellant. Basing their contention upon this conclusion, counsel for respondents insist that from this it necessarily follows that the $200,000 was intended as the consideration or purchase price for the option, and that this purchase price was payable at the happening of the events mentioned in the agreement, but in case the events did not happen the obligation to pay was, nevertheless, absolute, and hence the payments should be made when the events, by mere efflux of time, should have happened.

To sustain this contention counsel have cited a large number of concrete cases, which, they contend, are decisive of the controversy in their favor. We have examined all of the cases cited by them with much care, and we confess our inability to agree with them that the principles enunciated in those cases at all determine the controversy in their favor. Let us briefly review a few of those cases and see what is in fact decided in them.

The leading case cited by counsel is the case of *Alvord v. Cook*, 174 Mass. 120, 54 N. E. 499. The action there reported was one to recover commissions claimed by a real estate broker against the vendor for a completed contract for the sale of certain real estate. A part of the commission was paid at the time of the transaction, and the remainder was to be paid when the property was actually transferred from the vendor to the vendee. This transfer was never made, the vendor and vendee, for some reason, having mutually abandoned the agreement of sale. When the broker, therefore, demanded his commission, he was met with the claim that the event had never taken place, the happening of which marked the time when the commission was to be paid, hence there was no commission due or payable. Of course the court was not led astray by any such a subterfuge, but required the vendor to pay the broker his commission. The decision is, however, in effect, based upon the ground that the broker had done all he was required to do; that the commission was fully earned, and there was in fact an enforceable contract entered into between the vendor and the vendee which was abandoned by them; that the time of the transfer of the property was fixed as the time for the payment of the commission, and not as a condition the happening of which was to determine whether the broker should receive any commission at all. The court held that the abandonment of the original contract of sale by the vendor and vendee was no reason why the broker should not be paid his commission which was to be paid when the transfer of the property should be made. The time when the transfer of the property was

to be made was fixed as the time when the commission, then fully earned, should be paid. The making of the transfer thus only marked the time when an existing debt should be paid and was not intended as a condition precedent which must arise before a debt exists or an obligation to pay arises. In that case the commission being fully earned became payable when the transfer of the property under the agreement should have been made, and if this transfer was not made the law nevertheless implied a promise to pay.

The next case is *Page v. Cook,* 164 Mass. 116, 41 N. E. 115, 28 L. R. A. 759, 49 Am. St. Rep. 449. The action was one to recover on a promissory note which was made payable "when payor and payee mutually agree." The defense was that the payor had not agreed to pay, and hence the note was not due and the action was premature. The court again held that the promise was an absolute promise to pay; that to construe the words literally made the contract unfair and wholly unreasonable, and hence the parties must have intended that the payment should be made within a reasonable time, and the law implied such a promise.

The next case is *Eaton v. Yarborough,* 19 Ga. 82. The agreement sued on in that case was that the promisor would pay the debt "as soon as he finished the Methodist church which he was building in Rome." The promisor died before the church was completed, and when the administrator of the promisor's estate was sued he defended upon the ground that the condition upon which payment was to be made had never happened, and hence the estate was not liable. The Supreme Court of Georgia, however, held "that the promisor referred to the completion of the church by him *as a time* of payment, and not as a condition upon which only the note was payable." It was accordingly very properly held that the estate was liable for the debt.

The next case is *Crooker v. Holmes,* 65 Me. 195, 20 Am. Rep. 687. The action was based upon a promissory note made payable "when I sell my place whereon I now live in Oxford, Maine." To this was interposed the same defense

as in the preceding cases, and the court held that the plaintiff could recover for the reasons stated in the cases referred to.

The last case from which we shall quote is *Haines v. Weirick,* 155 Ind. 548, 58 N. E. 712, 80 Am. St. Rep. 251. In this case the promisor was sued on an agreement to pay a specific debt when a certain heir should attain the age of twenty-one years. The heir died before arriving at that age, and the defense was that the promisor was not required to pay. The court, as a matter of course, held the promisor liable. The question as to whether the promisor was obligated to pay at all · events was not made dependent on whether the heir should live to be twenty-one years old, but it was to mature when he did arrive at that age, and this merely marked the time when a subsisting debt became payable and thus enforceable.

The following cases, also cited by respondents, all in some way illustrtate the principles upon which the cases last quoted from are based: *Noland v. Bull,* 24 Or. 479, 33 Pac. 983; *Hicks v. Shouse,* 55 Ky. (17 B. Mon.) 483; *Randall v. Johnson,* 59 Miss. 317, 42 Am. Rep. 365; *Crass v. Scruggs & Co.,* 115 Ala. 258, 22 South. 81; *Hood v. Hampton, etc., Co.* (C. C.), 106 Fed. 408.

There is one controlling element illustrated in each of the foregoing cases, which is, that the courts, whenever possible, will enforce the contracts of the parties in accordance with their intention at the time the contract was entered into, if such intention can be ascertained from the language used by them when viewed and applied in accordance with the rules of construction we have heretofore referred to. Further, that the mere dry words of the contract are not alone controlling in determining the sense in which the parties intended them. Of course, courts may not in effect reform contracts under the guise of construing them, but when the intent is clear, when all of the provisions of the contract are considered, then merely to enlarge or to restrict the ordinary

meaning of words is not reforming the contract but is rather enforcing the precise contract made by the parties.

If, therefore, we apply the rules of construction as they are made to appear from the authorities herein cited to the contract in question, and in connection therewith consider the principles upon which the decisions to which we have referred are based, can the judgment of the lower court, in view of those rules and principles, be sustained? Referring, thus, directly to the contract in question, what was it that respondents offered to sell and appellant agreed to purchase? It was a mere option, a right to purchase something of value at some future time at a price then fixed. The property which respondents had the right to purchase was not of a known or fixed market value, but its value was speculative. Speaking in general terms, this value depended upon the quantity and quality of the ores in the underground workings of the mine, the cost of mining and reducing such ores so as to make them marketable, and the market price of the metals when reduced, which price was a fluctuating one as appears from the evidence. Neither the respondents nor the appellant knew the value of the property either at the time when the option was obtained or when it was transferred from respondents to appellant. The purchase price was fixed at $1,000,000. This might be either far in excess or far below the real value of the property. Respondents had, however, the exclusive right to purchase this property for the price aforesaid for a period of sixty days from the 17th day of January, 1907, and if the mine was worth a large amount in excess of said $1,000,000, then the right was a valuable right. On the 7th day of February, 1907, this right, however, was limited to the period of thirty-nine days, and unless respondents could dispose of their option within that time the right ceased to have any value at all. They insist, however, very strongly, that the mine may have been of a value far in excess of the price fixed for it, and hence a party desiring to purchase the mine at that price would be inclined to pay a large value for the right itself, and

hence, they assert, this is just what appellant did, namely, that he purchased and agreed to pay the $200,000 unconditionally for the right to purchase. If appellant did this, he should be required to pay what he agreed to pay. But is the contention that the option, at the time appellant purchased it, was necessarily valuable really a determining factor in the case from which we ought to say that for that reason appellant agreed unconditionally to pay the sum of $200,000 therefor? If we assume that the option was valuable, or that appellant thought so, which, for the purposes of this argument, would amount to the same thing, would it be reasonable to assume that from that fact alone appellant, as a prudent business man, would unconditionally agree to pay the sum of $200,000 for the right to purchase certain property of unknown and speculative value, which right, by its own terms, must terminate within thirty-nine days from the time he acquired the right? At the very time, at least, one other party had refused to take up the option at the price therein stated, as is shown by the evidence in the record. If the option was not taken up within the time fixed, appellant, as well as all others, would have the right to negotiate with the owners of the property and thus get an opportunity to purchase it. True, this might be at an advanced price; but whether this would be so or not was, in the nature of things, problematical merely. But, whatever the value of respondents' option was, unless they could sell it within the remaining thirty-nine days it was of no value to them or any one else. This they knew; and the appellant likewise knew. Again, the property consisted of a mine which was being worked and developed at the time, and had been so for some time prior thereto. The owners thereof must have known more about the actual value of the property than either appellant or respondents, and thus, when the owners fixed the selling price at $1,000,000, they evidently thought that that was a fair selling price, and that such would be the case for a period of at least sixty days from the time the option was given. The parties to the contract in question were

therefore dealing with things whose value, in the very nature of things, was uncertain and speculative. The price fixed was a very large sum of money, all of which had to be paid within a comparatively short period of time. Both parties to the contract then knew that at least only a limited amount of the purchase price could be gained from the mine itself and that the time in which the payments had to be made was a comparatively short time in which to raise so large a sum of money. It is is a matter of universal knowledge that $1,000,000 mining transactions, where the full consideration is paid in money within a period of time such as fixed in the option in question, are rare. But whether rare or not, all know that a deal which involves $1,000,000 of actual money is one of such magnitude that a man would enter upon with much care and circumspection. Moreover, the competitors for such a prize, if it indeed be one, are limited. Only a few can compete. Is it reasonable, therefore, to assume that a man, regardless of his wealth or resources, would unconditionally agree to pay the sum of $200,000 for the mere right to purchase for the period of only thirty-nine days property of unknown and uncertain value, the price of which was fixed at $1,000,000, all of which had to be paid in cash within eight months from the time the option was entered into? We do not hesitate to say that all reasonable men would agree that no reasonably prudent business man would enter into such an agreement. Did the appellant agree to do this? Again we say no.

Recurring, now, for a moment to the language of the contract itself, what is it that the parties there said? They start out with apt language indicating that respondents agree to and do sell and transfer to appellant a right or option for the sum of $200,000. That the wording of the contract constitutes a sale, and that the consideration named was $200,000 is quite clear. But the parties also proceed to state that for the consideration of $200,000 "said first parties (respondents) do by this conveyance for the consideration therein named convey the following described mining property and

claims to the said second party (appellant), to-wit." Then follows a long description of the property. Will any one contend that the language above used can be literally construed and applied? Clearly not. The contract as a whole is still merely a sale or transfer of a right or option to purchase, regardless of the inapt expressions just referred to. This is so, since, from the whole instrument and from the situation of the parties when the contract was entered into such was their ruling intention. Respondents, therefore, neither actually sold and conveyed nor actually agreed to sell and convey to appellant anything except the option to purchase certain specified property at a fixed price to be paid to the owner of said property. In other words, respondents transferred to appellant just what they had, namely, a mere right to purchase certain property. They had neither title nor interest in the property itself. All they had was a right to acquire the title thereto by paying a specified consideration within a fixed time. From the agreement, however, when literally construed, one would infer that respondents undertook to sell or convey to appellant some interest in and to some specific property instead of a mere right to acquire such interest. The language of that portion of the contract to which we have referred cannot be given its usual or ordinary meaning; that is, it cannot be literally construed and applied.

Passing, now, to that portion of the contract in which appellant promises to pay, does it contain a conditional or unconditional promise to pay the sum of $190,000? This part of the contract must, in the nature of things, be considered in connection with the option which appellant obtained from respondents since it expressly refers to it. In the option contract the time when the $1,000,000 purchase money for the property if purchased should become due and payable is stated. The principal sum was payable in four installments, the first of which was for $245,000 and the other three for $250,000 each. In framing this part of the contract, the parties, in view of its importance, might well

have exercised more care, and thus have been more specific in stating the terms of the agreement. And it is to be regretted that this was not done. This, however, does not change the terms of the agreement. We think that, with what is expressed and clearly implied in view of the circumstances disclosed by the evidence, the terms of the contract are not so obscure or ambiguous that the ruling intention of the parties cannot be ascertained therefrom. In one sense the parties in this case did what the Massachusetts court said was done by the parties in the case of *Alvord v. Cook, supra.* In that case it was assumed that the transfer of the property would be made. It was therefore stipulated that when the transfer should take place the commission should be payable. It must be remembered, however, that in that case there was an enforceable contract of sale entered into, while in the case at bar such a contract was merely in contemplation, and it was optional with the appellant whether he would enter into a binding contract of purchase or not. All this was in the minds of the parties, and, in view of this, it is not reasonable to assume that they would treat a mere option to purchase as tantamount to a completed contract of sale. In referring, therefore, to the time when the payments under the option should be made, it is both reasonable and natural to assume that the parties referred to the making of such payments as a condition upon which the remaining $190,000 should become payable, and not merely as a time limit beyond which appellant could not defer the payment of that sum. In other words, the parties contemplated that a binding contract of purchase and sale of the mining property should be entered into under the option before it should become obligatory upon appellant to pay any part of the $190,000. This condition is, we think, clearly implied in the agreement, and is therefore as binding as if expressed in apt terms. The real intention, therefore, was not that upon the happening of an event an existing debt should be paid, but it was that at said time an obligation should be created which was to be discharged at the

same time. This constitutes the distinguishing feature between this and all other cases that counsel for respondents have cited and to which we have referred. We think that, in view of the language contained in the whole agreement and the circumstances we have herein referred to, the foregoing conclusion is not only justified, but that it is the only fair and rational conclusion that is permissible. In the agreement a payment of $10,000 is provided for to be made "upon the execution of this agreement." At this point in the agreement the whole controversy arises. It is a matter of some significance that the whole of the remainder of the $200,000 is required to be paid in installments corresponding in number and in time of payment with the payments that are to be made in case the option to purchase is taken up. If the payment of the remaining $190,000 was an absolute and not a conditional obligation to pay, then there was no reason, at least none of importance, why the payments should be made at the same time that the payments on the purchase price of the property were made. If, upon the other hand, the obligation to pay the remaining $190,000 was conditional and dependent upon the fact of the payment of the purchase price of the property—that is, if the $190,000 was in the nature of a commission to respondents in addition to the $10,000 already paid to them—then there were very good, if not controlling, reasons why the remainder of the $190,-000 should be paid when the property was paid for. The language is that the first payment on the remaining $190,-000 is to be made "at the time when the said second party shall be required to pay to the Ludwig Copper Mining Company the first payment under the terms of said written agreement or any modification thereof as to the time of payment." The controlling words in the quotation, in view of the whole instrument, in referring to the payment to be made by appellant to the copper company, are "shall be required." Whether appellant was to pay the first $40,000 of the $190,-000 was thus made to depend upon whether appellant should be required to pay the purchase price of the property to said

copper company. This was not merely referring to an event the happening of which fixed the time of payment of an existing debt, but it amounted to the statement of a condition upon which the liability to pay the $40,000 was made to depend, namely, if appellant became obligated to pay the purchase price of the mine, then he also became obligated to pay the $190,000 and unless he assumed the first obligation the last did not arise. If, however, the first obligation was assumed, then the last would have to be discharged simultaneously with the first. This view is, we think, strengthened by what is said about the payments of the remaining $150,000 of the $190,000. This $150,000 was to be paid in "proportionate amounts on the dates when the payments *are made* by the said second party . . . to said copper company." (Italics ours.) Here, again, the language implies that the obligation to pay respondents is conditioned on whether the payments to the copper company are made, for the reason that it is assumed that said payments will be made, and therefore it is said that respondents are to be paid when the payments to the copper company *"are made."* It is, therefore, quite clear to us, under the authorities which we have cited, if appellant had in fact exercised his option to purchase the mining property from said copper company, and thus became obligated to pay the consideration therefor, that in such event the obligation to pay the respondents would have become absolute and, whether he made the payments to the copper company thereafter or not he would still have been required to pay respondents. This would be so, however, because the condition upon which appellant's liability depended had arisen, and when this had taken place the obligation to pay became absolute, and the appellant could not escape thereafter by merely refusing to make the further payments or to comply with the conditions of his contract. But it seems to us that it was clearly implied, in view of the language used in the agreements, and from the circumstances to which we have referred herein, that the obligation to pay respondents any part of

the remaining $190,000 was not to arise unless appellant exercised his right to purchase the mining property under the option he had obtained from respondents, and thus, in the language used by them, "shall be required to pay" said copper company. Why use the phrase "shall be required to pay" with respect to the first payment, and the phrase "when the payments are made" with respect to the other payments, if the parties did not intend that whether any obligation to make first payment should arise or not depended on whether appellant would obligate himself to pay said copper company? The parties in substance stated that appellant would not become obligated to pay respondents unless he purchased the mining property under the option agreement and thus should "be required" to pay the copper company the purchase price.

Counsel for respondents have also invoked the rule of construction usually termed "the rule of *contra proferentem*." Under this rule it is in effect contended that when a party in a written agreement chooses his own language in assuming an obligation, the language should be construed more strongly against the one who had the choice of words and who assumed the obligation. This rule is not favored by the courts, and will only be invoked in extreme cases and as a last resort. Besides, it is, as a general thing, invoked only in deeds poll, in insurance contracts, in contracts to avoid forfeitures, and in contracts that are not favored by law. Moreover, in order to make the rule applicable at all, it must appear on the face of the contract that the party against whom the rule is invoked made use of the language. Contracts, therefore, in which the parties thereto make mutual promises do not ordinarily come within this rule. (2 Page on Contracts, sec. 1122.)

Respondents also seem to lay much stress upon the fact that on the 15th day of February, 1907, when appellant paid them the $15,000 to which we have herein referred, a voucher to which a receipt was attached was presented to one of the respondents for signature. The voucher recited that it

was "payment on account for assignment of Ludwig option as per agreement of even date herewith. $15,000.00." The receipt read as follows: "Received of F. J. Hagenbarth fifteen thousand ($15,000.00) dollars in full payment of the above account." When the voucher and receipt were presented to Mr. Caine for signature, he changed it to read as payment "on account" instead of payment in full. Mr. Caine says that the appellant was present when the change was made and acquiesced in it, while appellant denies this, and says that he did not know of it until this action was begun. We confess that we are unable to see much force to respondents' contention. In the first place the transaction occurred at least seven days after the contract in question was written and signed. The mere fact that the contract was not enforceable until after the aforesaid transaction took place, which perhaps constituted a delivery of it, could in no way change either the sense of the language used or the intention of the parties. The conditions stated in the contract remained precisely the same after the transaction as they were written therein before the transaction took place, and nothing is discoverable from the transaction itself which would be a modification of any terms of the written agreement. In the second place, we cannot see in what way the change made in the receipt from the recital that it was payment in full to that that it was payment on account merely changed anything. Both recitatls were correct, depending solely upon how the transaction was viewed. If appellant took up the option, then it was clearly only part payment of the $200,000, and if he did not, then it was payment in full for the option. The mere fact, therefore, that, under the circumstances, the receipt was made to read one way or the other in no way affects the construction that is to be placed upon the contract which was executed some days before.

In view of the amount that is involved in this and in another case upon the contract in question, and in view that counsel on both sides argue with much force and ability that the right is with them, we have given the questions involved

even more than ordinary consideration and care. The more that we have reflected upon the questions involved and the more we have considered the language contained in the contract when viewed in the light afforded by the subject-matter and the surrounding circumstances herein detailed, the more have we become convinced that appellant's contention ought to prevail, and that the trial court, in construing the language contained in the contract, overlooked the doctrine which is well expressed in the scriptural text, that it is "not of the letter, but the spirit; for the letter killeth, but the spirit giveth life.".

For the reasons herein stated we are convinced that at the time the agreement was entered into it was not the intention of either respondents or appellant that he should be bound to pay any part of the remaining $190,000 unless he purchased the mining property upon which he obtained the option from respondents. We are further convinced that if such a promise had been squarely demanded by the respondents from appellant, he would have promptly refused to make it. Moreover, the demand of respondents, in view of what they had to sell and did sell, is unfair, unjust and wholly inequitable. For this reason, if for no other, therefore, we may well invoke the doctrine laid down by the Supreme Court of the United States in the opinion in *Noonan v. Bradley,* 9 Wall., where, at page 407 (19 L. Ed. 757), Mr. Justice Field states it in the following language: "When an instrument is susceptitble of two constructions—the one working injustice and the other consistent with the right of the case—that one should be favored which standeth with the right."

From what has been said it necessarily follows that the judgment of the district court ought to be, and it accordingly is, reversed. The case is remanded to that court with directions to grant a new trial. We are also of the opinion that in this case, in view of all the circumstances, neither party

should recover costs from the other on this appeal. It is so ordered.

STRAUP, C. J., and McCARTY, J., concur.

ON APPLICATION FOR REHEARING.

FRICK, J.

Respondents have filed a petition for a rehearing. It is contended that as the opinion now stands it is uncertain whether we held the contract passed on ambiguous or otherwise. We think it is manifest from the opinion that we considered the contract in question as belonging to that class where it is permissible to resort to proper extrinsic evidence of the surrounding facts and circumstances, **4** the nature of the subject-matter, the relations of the parties to the contract, and the purposes sought to be attained thereby, as an aid to the court in arriving at the real intentions of the parties. In our opinion, therefore, there is no merit whatever in the contention, and the application for a rehearing is denied.

STRAUP, C. J., and McCARTY, J., concur.