356 P.2d 625

**PLAIN CITY IRRIGATION COMPANY, a**
corporation, et al., Plaintiffs and
Appellants,

**v.**

**HOOPER IRRIGATION COMPANY, a cor-**
poration, et al., Defendants and
Respondents.

No. 9135.

Supreme Court of Utah.

Nov. 1, 1960.

Callister and Henriod, JJ., dissented.

Howell, Stine & Olmstead, David K. Holther, Ogden, Walter L. Budge, Atty. Gen., Robert B. Porter, Jr., Deputy Atty. Gen., for appellants.

Robert Spooner, City Atty., Findley P. Gridley, Asst. City Atty., Jack A. Richards, Ogden, for respondents.

CROCKETT, Chief Justice.

Ogden City petitioned for an order directing distribution of water in the Pine View Reservoir. The parties actively opposing the requested order are, The North Ogden Irrigation Company, Western Irrigation Company, Lynne Irrigation Company, and Plain City Irrigation Company. These irrigation companies represent the water users in the Lower Ogden River Valley and will be hereinafter referred to as the Lower Users. The latter appeal from a judgment that they are not entitled to the use of certain water in the reservoir; and Ogden City cross-appeals from the further portion of the judgment that requires it to sell this water to the Lower Users at cost plus administration expenses.

Prior to 1948 the water from Pine View Reservoir and certain wells and springs, had been shared by users who can be classified into three groups: Upper Valley Users, Ogden City, and Lower Valley Users. A dispute arose as to how the Lower Valley Users were adversely affected by Ogden City's use of the water from 48 wells located in the area where the Pine View Reservoir now stands; and a suit was filed. It was settled by stipulation which formed the basis of a decree entered by the district court April 1, 1948.

The present controversy devolves upon the interpretation of paragraph 7(a) of that decree, which reads as follows, with emphasis on the critical language:

"In exchange for the water which by diversion from such wells Ogden City withholds from the other water users of such river, [Lower Users] said City shall *set apart the water to which it is entitled upon 4,500 shares of the stock of Ogden River Water Users Association,* to the use of the other water users

of said Ogden River to be used by them at such times and in such manner as hereinafter set out, and shall be bound to make all payments for such water requisite to perfect the rights to the continued use of the water represented by such shares of stock, which exchange the Court decrees is a fair and equitable exchange."

At the time of the stipulation and decree the Ogden River Water Users Association, (hereinafter called the Users Association) by contract with the United States Government had storage rights in the Pine View Reservoir, and the right to receive a maximum of 44,175 acre feet of water. This, of course, included any lesser portion thereof as the natural recharge of the basin provided each year. There are 44,175 shares of stock outstanding in the Association. Hence, when water conditions were at best each share would be entitled to one acre foot of water. Ogden City holds 10,000, or approximately one-fourth, of the outstanding shares. In 1959 the water available to the Association was only approximately 15,000 acre feet, or one-third of an acre foot for each share of stock. The Utah Power and Light Company also owned rights to water stored in the reservoir for power purposes to the extent of 15,015 acre feet. Because of the water shortage during 1959, the Users Association purchased this water from the power company for its use during that year at an agreed price of $1.28 per acre foot. Ogden City was assessed and paid its pro rata share of this money on its 10,000 shares in the Association. Even with this additional water the Association had only about 70% of the 44,175 acre feet it would have had under optimum water conditions.

The controversy here hinges on whether the Lower Users are entitled to participate in the water of the Users Association only on the basis of the normal recharge of the basin as contended by Ogden City; or do they participate also in the additional water purchased from the power company for the year, 1959, as urged by the Lower Users. If the latter, that would seem to establish their right to similarly participate in additional water which the Users Association may so purchase in subsequent years, or even from other sources.

The trial court determined that the additional water purchased from the power company "was not intended by the parties to said stipulation, nor by the court in making its decree, to be included in the water controlled by paragraph seven of said decree" hereinabove quoted, and that the Lower Users were not entitled to participate in the additional water, but could have only their pro rata share of the quantity of water allocable to the shares on the basis of the situation as it existed at the time of the stipulation and the decree, and upon which they were based.

■ For reasons discussed below, we think that the determination just stated was correct. However, apparently as a palliative to the Lower Users and to avoid cutting them off entirely from any benefit from the purchased waters, the trial court stated that inasmuch as Ogden City was in a favorable position to obtain additional water, and having purchased the "power water," it held the amount of such water equivalent to that attributable to 4,500 shares in trust for the Lower Users and ordered the city to sell that water to them for the amount of the purchase, namely: $1.28 per acre foot, plus 6¢ per acre foot for administrative costs. While this seems to have been done to produce an equitable result, we can see no lawful basis for the latter ruling. The plaintiffs are either entitled to the additional water in proportion to the 4,500 shares, with Ogden to pay the costs as provided in paragraph 7(a) of the contract, or they are not entitled to such water at all.

In justifying its position that the Lower Users are not entitled to the purchased "power water" but only to that portion of the water normally available to their shares on the basis of the annual recharge of the water basin, Ogden City reasons that the reservoir contains two classes of water: the first is the water the Users Association would get on its shares based on the natural annual recharge of the basin; and the second is the water it purchased from the power company. As to the first class of water, it concedes that the Lower Users should have the portion thereof which the 4,500 shares allocated to them would represent from the sources available at the time the decree was entered into. But as to the second class, it urges that this is a separate quantity of water, the purchase of which was not in contemplation of the parties when the stipulation was entered into and the decree was made, and that therefore they had no intention of agreeing that the Lower Users would have the use of any such purchased water.

■ Resolution of the dispute depends upon the meaning to be given paragraph 7 (a) of the decree. The beginning point of interpretation of a contract is an examination of the language used in accordance with the ordinary and usual meaning of the words used, and in case of uncertainty the background circumstances may be looked to.[1] Note is to be taken of the words, " * * * said city shall set apart the water to which it *is* entitled upon 4,500 shares of the stock of Ogden River Water Users Association. * * *" (Emphasis added) The verb "is," being in the present tense, seems to indicate quite plainly that the parties were thinking in terms of the water then available to be dealt with. Further, it

---

1. See Auto Lease Co. v. Central Mutual Ins. Co., 7 Utah 2d 336, 325 P.2d 264; Restatement Contracts, Sec. 235(d); 3 Williston on Contracts, Sec. 618.

is reasonably to be assumed that the parties knew that Ogden was a city which would continue to grow; that its water needs would increase; that additional water would have to be procured and that expense would be involved in doing so. Notwithstanding this, no future tense appears in the language used and no reference was made to the future. Ogden City was charged with the duty of bearing all expense incident to the continued use of the water represented by such shares of stock and nothing was said about the Lower Users either being free from, or participating in, any additional expense that may be incurred in acquiring additional water other than that which was then available from the natural recharge of the basin.

In order to exact from Ogden City the right to this additional purchased water, which is of considerable value, it would be necessary for the Lower Users to show that the city had expressly so agreed. There is nothing in the stipulation or in the decree which affirmatively so commits it. From the language used, and particularly from the omission to mention any future acquisitions of water, it seems palpable that the parties did not have in contemplation future purchases of water, and that they did not intend that Ogden City was committing itself in perpetuity to bear the costs of any water, without limitation as to quantity, source, or means of acquisition, that the Users Association might acquire to be stored in this reservoir, knowing that 45% of it would forever inure to the benefit of the Lower Users.

It is obvious that if the Lower Users' contentions were upheld, Ogden City would be in a position which would discourage it from participating in any attempt to acquire additional water through the Users Association because it would have to pay about double for its share of any water so acquired. There would be other disadvantages: though it owns but a minority of stock in the Association, it would be bound by a decision of the Association to purchase water from which it would have to pay its proportionate share, yet be obliged to furnish 45% of any such additional water to the Lower Users without charge to them. The inequity of the situation is further accentuated by the fact that some of the Lower Users are members of the Users Association and would be in a position to encourage the purchase of water by the latter, knowing that they would receive about 45% of Ogden City's share at no cost. Generally, where there is doubt about the interpretation of a contract, a fair and equitable result will be preferred over a harsh or unreasonable one.[2] And an interpretation that will pro-

2. Caine v. Hagenbarth, 37 Utah 69, 106 P. 945; Cummings v. Nielson, 42 Utah 157, 129 P. 619; Continental Bank & Trust Co. v. Stewart, 4 Utah 2d 228, 291 P.2d 890; 3 Williston on Contracts, Sec. 620.

duce an inequitable result will be adopted only where the contract so expressly and unequivocally so provides that there is no other reasonable interpretation to be given it.

For the foregoing reasons we are of the opinion that the trial court was correct in determining that the "power water" purchased by the Users Association was not subject to allocation to the Lower Users as contended by them. In that respect the judgment of the trial court is affirmed. However, inasmuch as we see no basis for the determination that Ogden City is obliged to sell the additional water to the Lower Users, in that regard the decree is set aside. The parties bear their own costs.

WADE and McDONOUGH, JJ., concur.

CALLISTER, Justice (dissenting).

I dissent. Many years prior to the decree of April 1, 1948, there existed a controversy as to the effect of the draft on or use of water from wells in the Huntsville area by the defendant, Ogden City, on the flow of the Ogden River and the effect thereof on the rights of prior appropriators, both Upper Valley Users and Lower Valley Users.

By stipulation dated July 23, 1929, the parties to the controversy agreed, among other things, that if and when a reservoir was constructed on the Ogden River, Ogden City would supply to the flow of the Ogden River a quantity of water from the reservoir equal to that being drawn from the wells. The stipulation, which was embodied in a court decree, was a settlement of the instant water rights, and was also for a trial period for gathering facts and information, and for reservoir construction.

The Ogden River Waters Users Association was incorporated on or about November 1, 1933, prior to the construction of the Pine View Reservoir. Its articles provide, among other things, that it was organized for the purpose of purchasing, condemning, leasing or acquiring water, water rights, and other property. It was empowered to incur indebtedness and to contract with the United States *or other parties* for the purchase, acquisition, or lease of water, water rights, etc. Water was to be furnished only to its stockholders and the stock was made assessable.

The Association did, by contract with the United States, acquire a storage capacity in Pine View Reservoir of 44,175 acre feet. As stated in the majority opinion, this would normally entitle each share holder to one acre foot for each share of stock that he owned. Ogden City owned 10,000 shares of stock.

By the decree of April 1, 1948, it was provided in paragraph (7)(a) thereof:

"In exchange for the water which by diversion from such wells Ogden City withholds from the other water users of such river, said City shall set apart the water to which it *is* entitled upon 4500 shares of the stock of Ogden River Water Users Association, to the use of the other water users of said Ogden River to be used by them at such times and in such manner as hereinafter set out, and shall be bound to make all payments for such water requisite to perfect the rights to the continued use of the water represented by said shares of stock. * * *"

Thus, the Lower Users acquired the water rights upon the 4500 shares of stock in exchange for Ogden City acquiring a relatively firm supply of water from the wells.

Prior to the time the decree was entered, Ogden City was the owner of 10,000 shares of stock in the Association. It had thus acquired all of the rights and duties of a shareholder in the Association. If the Association had assessed each stockholder $1 per share, there is no question but that Ogden City, as owner of 10,000 shares of stock, would be required to pay $10,000. The fact that the Association then used the money assessed to purchase additional water would not remove the city's duty to pay the assessment.

The agreement between the city and the Lower Users did not in any way remove the duties that existed between the city and the Association. The city in effect assigned its rights as owner of 4500 shares of stock while retaining the duties of ownership. When the Association acquired new water these rights and duties attached. The agreement between the city and the Lower Users has effect only as between them. As between the Association and the city, the city must pay its share of the expense incurred in obtaining additional water. In turn the city has assigned its right to the use of $^{45}/_{100}$ths of the water to which it becomes entitled. Thus the duties remain the same while only the rights have been assigned by virtue of the decree.

The majority opinion places great reliance on the use of the verb, "is" in the court decree, stating that this indicates plainly that the parties were thinking in terms of water then available to be dealt with. There is no evidence in the record as to the amount of water available at the time the decree was entered. Evidently, the writer of the majority opinion assumes that there was a full supply (44,175 acre feet) available at that time, and this writer shall make the same assumption.

Following the majority opinion's reasoning to its logical conclusion, if the Lower Users are restricted to the water then avail-

able at the time of the decree and have no right to share in future acquisitions of water, then, by the same token, they should not share losses in times of short supply. In other words, the rights of the Lower Users to water would at all times equal that to which they were entitled at the time of the decree (4,500 acre feet). This regardless of additional acquisition of rights by the Association or the shortage of supply.

The foregoing reasoning is supported by the fact that under the decree Ogden City agreed to maintain these shares for the Lower Users "and to make all payments for such water requisite to perfect the rights *to the continued use of the water represented by said shares of stock.*"

Although the result reached by this process of reasoning is logical, it is unsound because based upon the false premise that the decree dealt only with water then available. The decree manifestly was for the purpose of apportioning future use of the water.

The logical conclusion is that the rights of the Lower Users in the 4500 shares of stock in the Association are the same as if they owned them outright—except for Ogden City's promise to make all payments necessary to keep them in good standing. The Lower Users share pro rata in any increment in the water available to the Association and likewise any losses.

Such an interpretation does not place an undue or unanticipated burden upon Ogden City. In order to secure the water from the wells, Ogden City was willing to assign its rights to the 4500 shares of stock and bear the expense of maintaining the water rights to which these shares are entitled. The Lower Users in exchange enabled the city to use the water from the wells by relinquishing rights to water to which they were entitled as prior appropriators.

A fallacy in the majority opinion is to treat the "power water" as new water in a class different than the water the *Association* was entitled to "on its shares based on the natural annual recharge of the basin." First, the *Association* is not entitled to water by virtue of its shares. The right which the Association has is a *storage right* of 44,175 acre feet by virtue of its contract with the United States. Secondly, the arrangement with the Utah Power & Light Company was that the latter forego its right to the release of 15,015 acre feet of water, which is not new or additional water. Had this been new or additional water, it would have been necessary for the Association to secure a change application from the state engineer.

The so-called "power water" was already in the reservoir and came from the same source and under the same right as the other water. By its arrangement with

the power company, the Association was merely endeavoring to exercise its storage capacity rights.

Under the decree Ogden City was bound "to make all payments for such water requisite to perfect the rights to the continued use of the water represented by such shares of stock." Each share of stock is entitled to its pro rata share of the water stored in reservoir by virtue of the Association's storage right. If it was necessary to pay the power company under the circumstances to take advantage, as far as possible, of the storage right, Ogden City should be required to pay the assessment upon the 4500 shares of stock, and the Lower Users should be entitled to their pro rata share of the "power water."

The majority opinion maintains that an interpretation of the decree in favor of the Lower Users would be inequitable because, among other things, the Lower Users who were stockholders in the Association could encourage the Association to acquire additional water. This does not seem to be borne out by the record, for the lower court made a specific finding that there were *only* four shareholders among the Lower Users.

I would reverse the lower court and enter judgment in favor of the Lower Users.

HENRIOD, J., concurs in the dissenting opinion of CALLISTER, J.